**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD WARREN MERRILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 0987** |
| **v.** | ) | |
| | ) | **Magistrate Michael T. Mason** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Claimant, Richard Merrill ("Merrill" or "claimant"), has brought a motion for summary judgment [23] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"). The Commissioner granted in part and denied in part Merrill's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423(d), and 1382c(a)(3)(A). The Commissioner filed a response [29] asking that we uphold the decision of the Administrative Law Judge ("ALJ"). We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Merrill's motion for summary judgment [23] is denied and the decision of the ALJ is affirmed.

**I.     BACKGROUND**

**A.     Procedural History**

Merrill filed his applications for DIB and SSI on April 15, 2008, alleging an onset

of disability on June 25, 2004.  (R. 151-164.)  The Social Security Administration denied Merrill's claims initially on June 20, 2008, and upon reconsideration on September 12, 2008.  (R. 95-109, 112-13.)  Merrill then requested a hearing, which took place on December 4, 2009 before ALJ Curt Marceille.  (R. 29-94.)

On January 17, 2010, ALJ Marceille issued a written decision finding that Merrill was disabled for purposes of the Act beginning on May 21, 2009, his fiftieth birthday, but not prior to that date.  (R. 11-25.)  Merrill filed a timely request for review (R. 6.)  The Appeals Council denied that request on December 17, 2010, making the ALJ's decision the final decision of the Commissioner.  (R.1-3); *see Jirau v. Astrue*, 715 F. Supp. 2d 814, 823 (N.D. Ill. 2010).  Merrill subsequently filed this action in the District Court.  The parties then consented to this Court's jurisdiction pursuant to 28 U.S.C § 636(c) [21].

### B.    Medical Evidence

Merrill alleges he became disabled after suffering injuries at work as an auto glass technician in February and June of 2004.  (R. 364.)  He has complained of, and sought treatment for, intractable lower back pain ever since those injuries.  Merrill's primary treating physician is Dr. George E. DePhillips, who referred Merrill to a number of other practitioners for physical therapy and pain management, among other things.  We address Merrill's treatment records below.

### 1.    Treating Physicians

A June 11, 2004 MRI of the lumbar spine revealed no sign of canal stenosis or foraminal narrowing, but did show a focal annular tear and disc protrusion at L5-S1, which "may be mildly encroaching" upon the left S1 nerve root.  (R. 719.)  Moderate degenerative disc desiccation at L5-S1 was also noted.  (*Id.*)  An MRI of the thoracic

spine revealed moderate degenerative disc changes at T4-T5 and T6-T11, and focal central disc protrusion at T4-T5 "encroaching upon the cord." (R. 722.) Milder disc protrusions without significant encroachment were noted at T5-T6 and T6-T7. (*Id.*) There was again no sign of canal stenosis or foraminal narrowing. (*Id.*) Cervical spine imaging showed moderate canal stenosis at C6-7, "post fusion C5-6," and a focal central disc bulge at C2-3 without significant encroachment. (R. 732.)

On June 30, 2004, Dr. DePhillips referred Merrill for physical therapy and would continue to refer him for therapy throughout 2006. (R. 398.) Many, if not all, of the physical therapy records appear to have been forwarded to Dr. DePhillips for review. During Merrill's first round of therapy sessions, from July 9, 2004 through August 27, 2004, Merrill expressed frustration with his inability to perform activities of daily living due to his pain, and showed minimal improvement. (R. 393, 394, 396.) The therapist noted limited flexibility and range of motion. (R. 394, 396.)

On July 6, 2004, Merrill visited Dr. Mauricio Orbegozo at Dr. DePhillips' request. (R. 810-11.) Merrill complained of low back and left lower extremity pain, which he rated a seven out of ten, and described as an "ache alternating with a sharp, stabbing pain." (R. 810.) At that point Merrill had taken Darvocet and Flexeril for pain relief. (*Id.*) Dr. Orbegozo's physical exam revealed primarily normal results. (R. 810-811.) Dr. Orbegozo did note a positive straight leg test on the left side at about 25 degrees. (R. 811.) He also noted that Merrill has "a very painful range of motion of his lumbar spine, particularly with flexion." (*Id.*) There was "positive facet pain bilaterally." (*Id.*) Dr. Orbegozo assessed lumbar degenerative disc disease and lumbar facet arthropathy, and gave Merrill a lumbar epidural steroid injection. (R. 811.) He then referred Merrill

back to Dr. DePhillips to determine whether surgery would be necessary. (*Id.*)

On July 29, 2004, Dr. Milena Appleby conducted a nerve conduction study at the request of Dr. DePhillips. (R. 695-99.) There were no signs of radiculopathy. (R. 696.) A post-discogram CT on September 21, 2004 revealed unremarkable results at the L3-L4 intervertebral disc, but showed evidence of degeneration at L4-L5 and L5-S1. (R. 290-94.)

On November 23, 2004, due to "failed conservative treatment," including the physical therapy and epidural steroid injections, Merrill underwent a decompressive lumbar laminectomy and spinal fusion at L5-S1 with "interbody bone graft arthrodesis and pedicle screw segmental fixation." (R. 673, 717.) Post-operative imaging revealed that the screws, disc cages, and bony alignment were intact. (R. 706.) A follow-up MRI on December 22, 2004 showed minimal degenerative bony spurring at L3-L4 and L5-S1. (R. 747.)

Merrill underwent another round of physical therapy from January 25, 2005 through April 22, 2005. (R. 378.) By the end of those sessions, Merrill reported increased lumbar range of motion, but had admitted that he was "overdoing it at home." (R. 380.) He demonstrated improved strength, but his muscles fatigued easily. (*Id.*) The therapist noted that Merrill would benefit from continuing physical therapy "to address remaining deficits and progress towards max functional capabilities and potential to [return to work] safely and effectively." (*Id.*) It appears, however, that Merrill did not follow-up with the physical therapy center at that time. (R. 378.)

Imaging of the lumbar spine on February 28, 2005 showed post-operative changes at L5-S1. (R. 702.) The vertebral alignment was normal. (*Id.*) Similar findings

4

were noted on April 25, 2005 and May 3, 2005.  (R. 700, 751.)  A post-discogram CT on June 14, 2005 showed post surgical changes "with posterior spinal fusion at the L5-S1 level."  (R. 284-87.)  Imaging from September 28, 2005 revealed that there was no disc herniation or significant spinal stenosis and the hardware was intact.  (R. 724-27.)  On November 7, 2005, surgical fusion changes were redemonstrated at L5-S1 and the bony alignments appeared "near anatomic."  (R. 715.)  There were mild degenerative changes of the thoracic spine.  (R. 712.)

On November 22, 2005, approximately one year after his spinal fusion, Dr. DePhillips admitted Merrill for a second surgery to explore the fusion and perform a probable revision at the L5-S1 level.  (R. 665-66.)  The operative report reveals that while Merrill initially recovered well from his spinal fusion, over the previous three to six months, he had developed progressively worsening lower back pain.  (R. 665.)  A CT scan of the lumbar spine prior to the surgery revealed probable pseudoarthrosis and failed fusion at the L5-S1 level.  (*Id.*)  Ultimately, the surgeons revised the fusion by removing the old hardware and installing new hardware.  (*Id.*)  Follow-up imaging on December 19, 2005 revealed post-surgical changes and normal lumbar alignment.  (R. 801.)  All remained intact as of February 27, 2006.  (R. 800.)

On May 8, 2006, imaging revealed a posterior metallic, posterior bony, and interbody fusion between L5 and S1.  (R. 799.)  A laminectomey defect was noted at L5. (*Id.*)  Stable post-surgical changes were noted on July 17, 2006.  (R. 798.)  By October 3, 2006, some granulation tissue was believed to be present within the epidural fat at the fusion level.  (R. 796-97.)  Minimal spinal stenosis was "noted at the L4-5 level related to mild disc bulging and hypertrophy of the posterior elements with a mild

bilateral foraminal narrowing present at L4-5 as well." (R. 797.) An MRI on November 28, 2006 revealed mild transfacetal stenosis at L4-L5. (R. 794.) Similar findings were noted on June 6, 2007. (R. 791-93.)

Merrill participated in physical therapy throughout 2006 and continued to complain of pain. (R. 449.) On May 5, 2006, the therapist noted that Merrill remains very active at home caring for his two-year old, which might be "flaring up his symptoms." (*Id.*) By June 6, 2006, Merrill had reported improvement with stairs and activities of daily living. (R. 448.) Later that summer, Merrill reported a decrease in his symptoms due to epidural injections, but continued to demonstrate low back mobility. (R. 591.) On October 25, 2006, the therapist noted that despite sixty-nine sessions, Merrill had shown no objective or subjective progress. (R. 568.) He recommended that Merrill participate in a work conditioning program. (*Id.*)

Merrill promptly began the work conditioning/hardening program on November 1, 2006. He participated in that program for five weeks until he was placed on "hold" status. (R. 308-11, 355.) Throughout the program, Merrill continued to report low back pain and discomfort with all activities. (*Id.*) On December 19, 2006, Bryce Davis conducted a "Key Functional Assessment," the result of which was to be a "valid representation of [Merril's] present physical capabilities." (R. 313-23.) During the assessment, Merrill demonstrated functional capacities at the medium to heavy level of physical demand. (R. 313.) Specifically, Davis contemplated that Merrill could occasionally lift and carry seventy-five pounds and frequently lift and carry thirty to thirty-five pounds. (*Id.*) Davis also recommended that Merrill be limited to only occasional kneeling, crawling, stooping, bending, squatting, rotating, walking, and

standing. (R. 313, 315.) Davis further noted that Merrill had significant complaints of pain throughout the assessment. (R. 313.) Ultimately, Davis recommended that Merrill participate in a structured independent exercise program. (R. 313.)

On July 24, 2007, Merrill underwent another surgical exploration of the fusion with Dr. DePhillips due to his progressively worsening back pain. (R. 656.) Merrill proceeded with this surgery despite his recent CT scans, which demonstrated a solid fusion. (R. 661.) The surgery revealed "evidence of excellent fusion and no evidence of reaction to the metal." (R. 663.) During the surgery, the L5-S1 posterior plate and screw instrumentation was removed. (R. 663.)

Dr. DePhillips' treatment notes reveal that Merrill returned to his office on August 29, 2007 for a follow-up evaluation. (R. 925.) Merrill complained of coccygeal pain, hip pain, and bilateral leg weakness and fatigue. (*Id.*) He voiced similar complaints at his monthly appointments with Dr. DePhillips through January of 2008. (R. 925-27.) Dr. DePhillips prescribed aquatherapy, which failed to provide significant pain relief. (R. 926-27.) On December 17, 2007, Dr. DePhillips ordered an MRI of the lumbar spine to assess the disc above the fusion. (R. 927.) An MRI of the lumbar spine dated January 14, 2008 revealed a mild amount of epidural fibrosis related to post-surgical change, but no significant spinal stenosis. (R. 786.) Additional imaging from that same date showed mild degenerative changes. (R. 788.)

On January 16, 2008, Dr. DePhillips stated that Merrill had "reached maximum medical improvement" and recommended that Merrill apply for disability benefits. (R. 927.) In Dr. DePhillips' opinion, Merrill "remains unemployable" because he could do no repetitive bending, twisting or stooping; could sit and stand for only thirty minutes before

needing a ten minute change of position; could occasionally lift five to ten pounds; and could do no frequent lifting or overhead work. (*Id.*) Dr. DePhillips also noted that the recent MRI revealed "worsening internal disc disruption at the L4-L5 level above his fusion, which in [Dr. DePhillips' opinion] will progressively worsen over the next 5-10 years and require further treatment... ." (*Id.*)

Merrill returned to see Dr. DePhillips on April 16, 2008 and continued to complain of lower back pain. (R. 928.) Merrill did report that on a recent vacation to Arizona, he experienced some relief due to lower humidity and warmer temperatures. (*Id.*) Dr. DePhillips again stated that Merrill remains "permanently and totally disabled" and referred him to the Pain & Spine Institute for pain management. (*Id.*)

Merrill sought treatment from Dr. Udit Patel at the Pain & Spine Institute from April to December of 2008. (R. 894-14, 930-42). At each visit he complained of muscle aches and low back pain, radiating to his legs. At his first visit, Dr. Patel noted "pain elicited over the bilateral lumbar paraspinal muscles" and limited active range of motion. (R. 895.) Dr. Patel prescribed Neurontin, Mobic, Gabapentin, Tramadol, and Vicodin. (R. 896-97.) Merrill did tell Dr. Patel that he was "trying to take as little medication as possible and still remain functional so that he doesn't become tolerant to the medications." (R. 896.)

Dr. Patel administered a diagnostic medial branch block injection on June 4, 2008. (R. 900-01.) On June 16, 2008, Dr. Patel gave Merrill a sacro-iliac joint injection, after which Merrill reported a 40-50% relief of pain and the ability to "move around better." (R. 902-05.) On July 9, 2008, Merrill underwent a radiofrequency ablation ("RFA") of the sacro-iliac joint strip lesion medial branch nerves. (R. 907-10.) On his

follow-up visit on July 29, 2008, Merrill reported "a significant difference in terms of pain." (R. 910.)

Dr. Patel administered a second sacro-iliac joint injection on August 11, 2008. (R. 912-14.) Merrill reported a three day period of pain relief at his next visit, but reported that the Vicodin was not working. (R. 930.) Dr. Patel prescribed Ambien instead. (*Id.*) On September 2, 2008, Dr. Patel performed another RFA strip lesion, this time on the right side, which Merrill reported "balanced him out." (R. 932-36.) By his November and December appointments, Merrill was suffering increased pain due to decreasing temperatures. (R. 939-42.) On December 15, 2008, Merrill explained to Dr. Patel that he only takes the Gabapentin sparingly because he fears the "sedation" it causes. (R. 941.)

Merrill did not return to see Dr. Patel again until July 9, 2009. (R. 943-44.) Merrill explained that while visiting his family in Arizona, he felt significant pain relief due to the warmer weather. (R. 943.) But, upon returning to the area in March, his pain had returned to his "baseline." (*Id.*) Merrill also reported that he had been taking his medications sparingly. (*Id.*) Dr. Patel prescribed refills of all of his pain medications. (R. 944.)

On October 15, 2009, approximately a year and a half after his last appointment, Merrill returned to see Dr. DePhillips. (R. 929.) Merrill complained of low back pain radiating to the buttocks and both hips. (*Id.*) Dr. DePhillips found that Merrill had good strength in quadriceps function, dorsiflexion, and plantar flexion. (*Id.*) Dr. DePhillips assessed "either a failed fusion, pseudoarthrosis, adjacent segment degeneration at the L4-L5 level, scar tissue and arachnoiditis or sacroiliac dysfunction as a result of the

9

fusion." (*Id.*) He recommended imaging of the lumbar spine to further assess his impressions. (*Id.*) In an addendum dated November 18, 2009, Dr. DePhillips stated that Merrill "remains totally and permanently disabled and unable to return to meaningful employment." (*Id.*)

On April 15, 2010, after the ALJ rendered his opinion, Dr. DePhillips completed a physical RFC assessment, which he categorized as a "clarification." (R. 274, 947-54.) According to Dr. DePhillips, Merrill can only occasionally lift and carry ten pounds and was limited in his ability to push and pull due to his chronic and severe pain. (R. 948.) He also concluded that Merrill could never frequently lift any amount of weight, and could never stand, walk, or sit for any period in an eight hour workday because he would require more than normal break time. (*Id.*) In Dr. DePhillips' opinion, Merrill requires work restrictions of no repetitive work, no reaching forward, no lifting more than eight pounds once per hour, and must be allowed to sit or stand as needed with thirty minutes of rest for every thirty minutes of work. (R. 949.) He also opined that Merrill could never climb, balance, stoop, kneel, crouch, or crawl, was limited in his reaching and handling, and must avoid all exposure to certain environmental hazards. (R. 949-51.)[1]

### C.    State Agency Consultants

On June 12, 2008, agency physician Dr. Francis Vincent conducted a Physical Residual Functional Capacity ("RFC") Assessment. (R. 884-91.) Dr. Vincent concluded

---

[1] Because the ALJ did not consider this most recent assessment from Dr. DePhillips, it "cannot now be used as a basis for finding reversible error." *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

that Merrill could occasionally lift and/or carry twenty pounds, could frequently lift ten pounds, could stand and/or walk for at least two hours in an eight hour workday, and could sit for about six hours in an eight hour workday.  (R. 885.)  As for postural limitations, Dr. Vincent found that Merrill could only occasionally climb, stoop, kneel, crouch, and crawl due to his "[lumbar] fusion, revision and [chief complaint] of pain."  (R. 886.)  Dr. Vincent found no additional postural, manipulative, visual, or communicative limitations.  (R. 886-88.)  However, Dr. Vincent did conclude that Merrill should avoid concentrated exposure to hazards such as machinery and heights due to his pain medications.  (R. 888.)  On September 10, 2008, Dr. Solfia Saulog reviewed and affirmed the June 12, 2008 RFC assessment, noting Merrill's continued relief from injections.  (R. 915-17.)

### D.    Merrill's Testimony

Merrill appeared with counsel at the hearing before ALJ Marceille on December 4, 2009.  Throughout the hearing, Merrill leaned on the table with his elbows in an attempt to take the weight off of his back.  (R. 59.)  Merrill was born on May 22, 1959, making him fifty years old at the time of the hearing.  (R. 35.)  He completed two years of college and obtained an associate's degree in electronics.  (R. 36.)

Merrill has four children ranging from ages twenty-one to five.  (R. 35-36.)  At the time of the hearing, Merrill resided with his two oldest sons.  (R. 51.)  Merrill's youngest son was born about two months before his injury at work.  (R. 36.)  After he was born, Merrill did provide care for him, but usually with the assistance of some of his older children.  (R. 36, 38, 41.)  At times, Merrill had to chase his youngest son around and

11

pick him up for diaper changes.  (R. 42, 44.)

When asked about his pain, Merrill explained that he suffers from a constant pain in his lower back that radiates to his legs, hips, and buttocks, and increases with movement.  (R. 40, 66.)  He takes Gabapentin, Tramadol, and Meloxicam, which reduce his pain "somewhat."  (R. 40.)  He also takes Ambien to help him sleep.  (*Id.*)  As for side effects, Merrill complained of dizziness, nausea, lack of concentration, sleeplessness, and memory loss.  (R. 40, 42.)  Merrill also takes hot baths, uses heating pads, and rests a lot.  (R. 43.)  At the time of the hearing, Merrill rated his pain as a six or a seven, and explained that he did not take his medication that day because he had to drive to the hearing.  (R. 40.)

Merrill testified that he can walk for approximately a quarter of a mile if he were "forced to," but would be "down for the day" after doing so.  (R. 43-44.)  On a good day, he can stand for an hour, but would suffer from increasing pain throughout that hour. (R. 44, 70.)  On a bad day, he can stand for only fifteen minutes.  (*Id.*)  As for sitting, Merrill claims that he can sit for an hour and a half to two hours on a good day and for a half an hour to forty-five minutes on a bad day, but again testified that he would suffer through constant pain while sitting.   (R. 44, 70-71.)  Merrill can lift eight to ten pounds at least on occasion.  (R. 44-45.)  Merrill brought a cane to the hearing and testified that he "will not leave the house without it."  (R. 57.)  Occasionally, he uses the cane at home if his legs feel too weak.  (R. 57-58.)  He complained of difficulty getting up and down the stairs in his two-story house.  (R. 58.)  Merrill also testified to difficulty reaching for objects.  (R. 66-67.)

When asked about the results of the Key Functional Assessment, Merrill claimed

12

that he was told by his attorney for his worker's compensation case and his physicians that if he did not give 100% he would lose his worker's compensation benefits.  (R. 39.)  According to Merrill, he could not get out of bed for two or three days after the assessment.  (*Id.*)

At the hearing, Merrill explained that his wife and youngest son moved to Arizona three years ago to help care for her mother.  (R. 50, 59.)  He has not moved out there because of his ongoing worker's compensation case.  (R. 79.)  Merrill testified that he has been to Arizona three times in the years preceding the hearing; once in February or March of 2008, once for Christmas in 2008, and once for his Aunt's funeral a few months before the hearing.  (R.  45, 75.)  He did not see a doctor while he was there, nor did he get a refill of his pain medications, leaving him out of medication for about a month during his Christmas trip.  (R. 55-56.)  He did testify that his back felt better while in Arizona due to the weather.  (R. 48.)

Merrill drove back from his most recent trip to Arizona along with one of his sons and a friend.  (R. 47.)  He drove for approximately eighteen to nineteen hours of the thirty hour trip.  (*Id.*)  He explained that they drove through the night because if he stopped, he would not be able to "get behind the wheel again."  (*Id.*)  He also drove for a portion of the return trip following his Christmas visit.  (*Id.*)  He testified that he cried most of the way and did not get out of bed for at least three days after his most recent trip, nor do much of anything for a week.  (R. 57, 69-70.)

On a typical day, Merrill wakes up, showers, eats a bowl of cereal, and then applies for jobs, both in person and on-line, through a vocational rehabilitation program that he is required to participate in due to his worker's compensation claim.  (R. 52, 62.)

He lays down for about an hour or two around 10:00 a.m. and then prepares his lunch in the microwave.  (*Id.*)  By 4:00 or 5:00 pm, Merrill claims he is "basically in bed for the rest of the night."  (*Id.*)  However, he testified that he only gets about four and a half hours of sleep each night due to his pain.  (R. 68.)  Merrill explained that he has difficulty dressing himself because bending causes him increased pain.  (R. 65-66.)

As a general matter, Merrill's sons do the majority of the house work.  (R. 60.) Merrill does very little cooking and minimal housekeeping.  (R. 48, 50, 60.)  He can do about fifteen minutes worth of dishes before needing to rest for thirty minutes.  (R. 73.) His children do his laundry.  (R. 49.)  He does not take out the garbage or do yard work. (*Id.*)  Merrill usually goes to the grocery store with his sons and leans on the cart while they shop.  (R. 48-49.)  On rare occasions, he goes by himself, but just to pick up a few things.  (R. 53, 61.)  Merrill testified that after he goes grocery shopping, he will usually spend a day and a half "doing nothing in bed."  (R. 62.)  He testified that he can drive comfortably for a half an hour to forty five minutes, but admitted that on one of his trips back from Arizona he drove for ten to fifteen consecutive hours.  (R. 48.)  He does not drive while on his medication because it makes him too light-headed and dizzy.  (R. 56-57.)

### E.     Vocational Expert's Testimony

Vocational Expert ("VE") Glee Ann Kehr also testified at the administrative hearing.  VE Kehr first identified Merrill's past relevant work as an auto glass technician, which the DOT classifies as medium and semi-skilled, but which Merrill performed at the heavy level of exertion.  (R. 81.)

Next, the ALJ asked the VE to consider a hypothetical individual that can perform

"light work as the regulations define that term," but with the exception that the individual "can stand and walk for two hours, sit for six hours, perform posture activities on an occasional basis," cannot climb "stairs, ramps, ladders, ropes, and scaffolds," and is limited from "concentrated exposure to hazards." (R. 81.) The ALJ noted that these were the limitations identified by state agency consultant Dr. Vincent on June 12, 2008. (*Id.*) The ALJ then asked the VE what positions, if any, such an individual could perform. (*Id.*) The VE responded that the individual could work in the sedentary level positions of order clerk (approximately 8,800 positions in the Chicago area), account clerk (3,800 positions), or telephone clerk (4,700 positions). (R. 81-82.)

The ALJ then asked the VE to consider an individual who is limited to sedentary work, capable of lifting between five and ten pounds, can sit and stand for thirty minutes at a time, after which he needs to change positions for ten minute intervals, and can engage in no repetitive bending, twisting, stooping, frequent lifting, or overhead work. (R. 82.) It should be noted that this hypothetical encompassed the limitations proposed by Dr. DePhillips on January 16, 2008. (R. 90.) In response to this hypothetical, the VE stated that assuming the individual could stay on task 85% of the time, he could perform the same three positions she already stated, but explained that the number of positions available would be reduced by 50% due to the need for a sit/stand option. (R. 82-83.)

The VE also answered questions from Merrill's attorney. In response to those questions, VE Kehr explained that an individual with three absences a month, or who could do no reaching or grasping, would be barred from competitive employment. (R. 83.) She further testified that a person who needed thirty minute breaks after every

15

thirty minutes of activity would not be employable.  (R. 87.)  Claimant's attorney then

asked the VE to generally describe the work performed by order clerks, account clerks,

and telephone clerks.  (R. 88.)  After the VE explained those positions, Merrill claimed

that he would be unable to perform those positions because of his inability to

concentrate and the fact that he could not guarantee he could be at work five days a

week.  (R. 89.)

## II.    ANALYSIS

### A.    Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence

and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940

(7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Scheck v. Barnhart*, 357 F.3d 697,

699 (7th Cir. 2004) (*quoting Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001)).

We must consider the entire administrative record, but will not "re-weigh evidence,

resolve conflicts, decide questions of credibility, or substitute our own judgment for that

of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting

Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  "While the ALJ is not required to

address every piece of evidence," he must "build an accurate and logical bridge from

the evidence to his conclusion."  *Clifford*, 227 F.3d at 872.  The ALJ must sufficiently

articulate his assessment of the evidence to assure the reviewing court that he

"considered the important evidence" and to enable the court to "trace the path" of his

reasoning.  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

**B.    Analysis Under the Social Security Act**

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Act.  A person is disabled if he or she is unable "to engage in any substantial activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To determine whether an individual is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.  20 C.F.R. §§ 404.1520, 416.920; *Scheck*, 357 F.3d at 699-700.  The claimant has the burden of establishing a disability at steps one through four.  *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  The burden then shifts to the Commissioner at step five.  *Id.*

ALJ Marceille followed this five-step analysis.  At step one, he determined that Merrill has not engaged in substantial gainful activity since the alleged onset date of June 25, 2004.  (R. 18.)  Next, at step two, the ALJ concluded that Merrill has the following severe impairments: "a disorder of the back involving post lumbar fusion surgery and a failed back syndrome."  (*Id.*)  At step three, ALJ Marceille concluded that Merrill does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, App. 1. (R. 18-19.)

The ALJ went on to determine Merrill's RFC and found that since his alleged onset date, Merrill retained the RFC to "perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) and as noted in Dr. George DePhillips' January 26, 2008 treatment notes." (R. 19.) Specifically, the ALJ concluded that Merrill can lift and carry ten pounds occasionally and five pounds frequently, and can sit and stand for thirty minutes at a time, after which a ten minute change in position is needed. (*Id.*) He also concluded that Merrill can perform no repetitive bending, twisting, or stooping, and is unable to perform frequent lifting or overhead reaching. (*Id.*) Because the demands of Merrill's past position as an auto glass technician exceeded his RFC, the ALJ concluded that Merrill could not perform his past work. (R. 23.) The ALJ went on to find that prior to Merrill's fiftieth birthday, he retained the capacity to perform work in the national economy. (R. 24-25.) However, the ALJ concluded that following Merrill's fiftieth birthday, Medical-Vocational Rule 201.14 directed a finding of disabled. (R. 25.)

Merrill now takes issue with the ALJ's determination that he was not disabled prior to his fiftieth birthday. Merrill raises four arguments on appeal: (1) that the ALJ failed to adequately consider the effect of pain on his ability to work; (2) that the ALJ erred in rejecting Dr. DePhillips' opinion that he was disabled; (3) that the hypothetical to the VE was inconsistent with the limitations proposed by DePhillips; and (4) that the ALJ erred by applying the age categories "mechanically" in this case. We address these arguments in turn below.

### C. The ALJ Properly Considered Merrill's Allegations of Pain and Properly Assessed his Credibility.

Merrill first argues that the ALJ failed to properly assess his credibility, thereby inadequately considering the effect of pain on his ability to work. We disagree.

In assessing a claimant's allegations of pain, the ALJ must first consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms. Social Security Regulation ("SSR") 96-7p, 1996 WL 374186, at *2. Once such an underlying impairment has been shown, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." *Id.* If the claimant's allegations of pain are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. *Id.* In doing so, the ALJ must consider (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* at 3.

It is well settled that an ALJ's credibility assessment is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). As a result, we will overturn an

ALJ's credibility assessment only if it is "patently wrong."  *Id.*  In any event, "the ALJ must explain her decision in such a way that allows us to determine whether [he] reached [his] decision in a rational manner, logically based on [his] specific findings and the evidence in the record."  *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011).

Here, the ALJ determined that Merrill's impairments could reasonably be expected to cause the alleged symptoms, but went on to find that Merrill's allegations of disabling pain and limitations lacked credibility.  As an initial matter, we note that in making his credibility assessment, the ALJ used the boilerplate language that has been criticized by the Seventh Circuit.  *See Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012).  However, the use of this language alone does not require remand.  Instead, we must assess the "sufficiency of the analysis that accompanies the language."  *Doering v. Astrue*, No. 10 C 5730, 2012 WL 1418851, at *3 (N.D. Ill. Apr. 24, 2012); *see also*, *Richison v. Astrue,* 462 Fed. Appx. 622, 625 (7th Cir. 2012).

In assessing Merrill's credibility, the ALJ articulated specific reasons supporting his finding that Merrill's pain did not cause the extreme limitations he claimed.  He commented on Merrill's three trips to Arizona and determined that Merrill's ability to drive ten to fifteen hours straight and ride in a car for thirty hours straight, without medication, undermined his alleged limitations, in particular that he must lay down for up to a day even after very minimal activity.  ALJ Marceille also commented on Merrill's ability to care for his young son at times.  Contrary to Merrill's argument, in relying on this activity to discredit Merrill's claims, the ALJ was not making "unfounded sociological speculations."  (Cl.'s Mot. at 10.)  Instead, the ALJ simply noted that this was one factor,

among others, that led him to conclude that Merrill was functionally more capable than he claimed.

Further, the ALJ noted that despite Merrill's claims of side effects from medications and his need to rest after activity, he was unable to find many instances where Merrill reported such extreme side effects and limitations to his treating physicians. More importantly, and as discussed in more detail below, the ALJ relied on the fact that the limitations imposed by Merrill's own treating physician, Dr. DePhillips, did not preclude all competitive employment.

All of this leads us to conclude that the ALJ properly considered Merrill's allegations of pain and that his credibility determination was not patently wrong.

D. **The ALJ Did Not Err When He Declined to Accept Dr. DePhillips' Opinion that Claimant Was Disabled.**

Merrill also claims that the ALJ erred by rejecting Dr. DePhillips' statement that the claimant could not work. Again, on January 16, 2008, Dr. DePhillips stated that Merrill had reached maximum medical improvement and was unemployable. As explained above, Dr. DePhillips also set forth certain functional limitations. On April 16, 2008, Dr. DePhillips reiterated his opinion that Merrill was disabled. In Merrill's opinion, the ALJ should have afforded Dr. DePhillips' conclusion controlling weight. Merrill also argues briefly that the ALJ failed to properly consider Dr. Patel's treatment notes relating to spinal instability.

Although the claimant does not say as much, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial

21

evidence." 20 CFR § 404.1527(c)(2); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). Here, what claimant seems to ignore is the fact that the ALJ afforded Dr. DePhillips' opinion a great deal of weight by adopting the functional limitations he imposed in January of 2008. It was those limitations that the ALJ included in his second hypothetical to the VE and that are ultimately encompassed in the ALJ's RFC determination.

We do recognize that the ALJ declined to accept Dr. DePhillips' conclusory opinion that Merrill was disabled or to impose any greater functional limitations than contemplated by Dr. DePhillips, which may have led to a finding of disability. With respect to the former, we find no error, as it is well settled that the determination of disability is expressly reserved to the Commissioner. 20 CFR § 404.1527(d)(1). Thus, a statement by a medical source that an individual is disabled is not afforded any special significance. 20 CFR § 404.1527(d)(2); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001.)

We also find no reversible error in the ALJ's decision not to impose greater functional limitations than imposed by Dr. DePhillips. In assessing Merrill's RFC, ALJ Marceille properly considered the medical records, the claimant's statements, and the opinions from the treating and non-treating sources. *See* 20 CFR § 404.1545(a)(3). The ALJ also explicitly articulated why an imposition of greater limitations would be inconsistent with the record before him. Among other things, he noted the December 2006 assessment that Merrill could perform light to medium work and the State Agency consultants' conclusions that Merrill could perform light work.

Lastly, we find no merit to Merrill's assertion that the ALJ mishandled certain

portions of the treatment records from Dr. Patel. The ALJ considered Merrill's treatment with Dr. Patel, albeit briefly. Additionally, Dr. Patel expressed no opinion as to Merrill's functional capabilities.

For all of these reasons, we find no error in the ALJ's treatment of Dr. DePhillips' opinion or the record before him.

### E. Claimant's Remaining Arguments Lack Merit.

We comment only briefly on claimant's remaining arguments. According to claimant, the ALJ erred by omitting certain limitations in his hypothetical to the VE. Specifically, Merrill argues that the ALJ should have included his inability to stay on task 85% of the time, pain upon movement, and lack of concentration.

It is well settled that the ALJ need only "incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007). ALJ Marceille explained that he found little credibility to Merrill's claim that he would be off task more than 15% of the day. And, having already concluded that the ALJ properly assessed Merrill's credibility and RFC, we find no error in his hypotheticals to the VE.

Lastly, Merrill takes issue with what he views as the "mechanical" application of the Medical-Vocational guidelines. Again, ALJ Marceille found that Merrill was disabled as of his fiftieth birthday after applying Medical-Vocational Rule 201.14. That Rule directs a finding of disabled for individuals aged 50-54 ("closely approaching advanced age"), who are limited to sedentary work, have a high school degree, but have no transferable skills from previous work. Claimant now seems to argue that the ALJ should have placed Merrill in the "closely approaching advanced age" category from his

alleged onset in 2004 through his fiftieth birthday, five years later.

Unlike claimant, we fail to see how this is a borderline situation that required the ALJ to consider whether Merrill should have been placed in the closely approaching advanced age category for the entire period prior to his fiftieth birthday. As contemplated by the Social Security Administration's "Hearings, Appeals and Litigation Law Manual," a borderline situation may exist when "the age category changes within a few months after the alleged onset date, the date last insured (or the prescribed period), or the date of the ALJ's decision." *Hearings, Appeals and Litigation Law Manual,* II-5-3-2; *see also Smith v. Barnhart*, No. 00 C 2643, 2002 WL 126107, at *3 (N.D. Ill. Jan. 31, 2002) (noting that to decide whether a borderline situation exists, the ALJ should determine whether a claimant's age is within a few days or a few months of a higher age category at the time the disability insured status expires). This is not the situation here where claimant was forty-five at the time of his alleged onset, and had already reached age fifty, and the next age category, by his date last insured (December 31, 2009) and the ALJ's decision. Thus, we find no error in the ALJ's application of the vocational guidelines.

**III.   CONCLUSION**

For the foregoing reasons, we conclude that the ALJ's decision was supported by substantial evidence and free from legal error. As such, claimant's motion for summary judgment is denied and the decision of the ALJ is affirmed. It is so ordered.

**ENTERED:**

_Michael T. Mason_
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:**       **September 13, 2012**